IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | |
| GORDON EVANS (2) | 1:16-CR-427-AT-JKL-2 |

## NON-FINAL REPORT AND RECOMMENDATION

This case is presently before the Court on Defendant Gordon Evans's Motion to Suppress Intercepted Communications and Evidence Derived Therefrom, Pursuant to Title III. [Doc. 1148.] In his motion, Evans moves to suppress all intercepted communications obtained through wiretaps that were approved by the Superior Court of Gwinnett County, Georgia, and any derivative evidence, on the grounds that the applications failed to establish a necessity for the wiretaps or that less intrusive means would not meet the goals of the investigation. [*Id.*] The government has responded to this motion, [Doc. 1235], and has filed the wiretap orders and applications under seal [Doc. 1250]. Evans did not file a reply or request an extension, and the time for doing so has passed. [*See* Doc. 1210 (granting Evans until March 20, 2020 to file any reply in support of his motion).] For the reasons stated below, it is **RECOMMENDED** that the motion be **DENIED**. The Court

reaches this conclusion principally because Evans lacks standing to challenge the wiretaps since, at the time the wiretaps were active, he was incarcerated and could not lawfully possess a cell phone; thus, he had no reasonable expectation of privacy with regard to any intercepted communications while using a contraband cell phone or phones. Alternatively, even if Evans had standing to challenge the wiretaps, he has not met his burden of showing that the wiretap applications failed to demonstrate necessity.

## I.   BACKGROUND

### A.   Summary of Charges Against Evans

The second superseding (and now operative) indictment in this case charges Evans with one count of conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 1) and two counts of conspiracy to commit murder under the Violent Crimes in Aid of Racketeering Activity ("VICAR") (Counts 6 and 7). [Doc. 1158 (Second Superseding Indictment).] According to the present indictment, Evans is a high-ranking member of the Nine Trey Gangsters, a street gang with members in New York, Georgia, and other southeastern states. [*Id.* at 2-3, 13.] The gang allegedly traces its origins to the United Blood Nation, a gang alliance that formed at Rikers Island in New York in the early 1990s and that is also loosely affiliated with the Bloods gang of Los Angeles. [*Id.* at 2-3.] The

2

second superseding indictment alleges that the Nine Trey Gangsters operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4). [*Id.* at 10-11.]

As to Evans's personal participation in the RICO conspiracy, it is alleged that sometime around November 2015, while Evans was in prison, he ordered the killing of an individual, Jeffery Anderson, because Anderson owed him $500 (Overt Act 12). [Doc. 1158 at 20.] On or about November 24, 2015, two fellow Nine Trey Gangsters, D.L. and D.M., allegedly carried out that order, shooting and killing Anderson (Overt Act 13). [*Id.*] After Anderson was killed, Evans allegedly told D.M. that Evans, D.M., and D.L. should talk to get their stories straight in case the police interview them about the murder (Overt Act 14). [*Id.*]

Further, it is alleged that on or about February 15, 2016, Evans allegedly participated in a gang meeting with codefendants Patrick Caple, Gary Sartor, and Tyrone Clark via conference call, during which Evans told them that they "are responsible for the actions of the others underneath you" (Overt Act 17). [Doc. 1158 at 20-21.] The following day, Evans was purportedly found in possession of a gang roster, gang literature, and a contraband cell phone in his prison cell (Overt Act 18). [*Id.* at 18.]

Finally, in the Spring of 2016, Evans, Caple, and Sartor allegedly ordered fellow gang member J.L. #2 to murder the family of D.M. on the belief that D.M. was cooperating with law enforcement regarding the Anderson murder (Overt Act 20). [Doc. 1158 at 21.] J.L. #2 did not carry through on the order, and allegedly on or about June 10, 2016, seven individuals—D.S., A.H., A.A., L.F., T.B., J.C., and D.D.—attempted to kill J.L. #2 on orders from Caple and Evans, in retaliation for J.L. #2's refusal to kill D.M.'s family and because J.L. #2 insulted Evans (Overt Act 21). [*Id.* at 21.] Evans's alleged participation in those attempted murders also forms the basis for the conspiracy to commit VICAR murder charges in Counts 6 and 7. [*Id.* at 47-48.]

**B.     The State Wiretaps on Target Telephones 1 Through 7**

On January 28, 2016, Gwinnett County Superior Court Judge George F. Hutchinson III issued an order authorizing the interception of wire and electronic communications over three telephones for a period of 30 days:

(1)     a telephone with the number 404-205-3134, allegedly used by Evans (Gwinnett Target Telephone ("GTT") 1);

(2)     a telephone with the number 404-623-5727, allegedly used by Durell Lewis (GTT 2); and

4

(3)     a telephone with the number 678-464-5331, also allegedly used by

Lewis (GTT 3).

(*See* Gov't Resp. Ex. 1 [Doc. 1250]; *see also* Aff. of Paul Szabo in Support of

Wiretap TT1 ("TT1 Aff.") ¶ 19 [Doc. 1250-1 at 28-98].[1])  After the wiretap order

was issued, law enforcement determined that the service plans for GTT 1 and GTT

2 had been recently cancelled and the phones were no longer active; thus, no

relevant communications were intercepted over GTT 1 or GTT 2.  (TT1 Aff. ¶ 19.)

Interception over GTT 3—allegedly belonging to Lewis—began on January 29,

2016 and continued to February 16, 2016.  (*Id.*)

On February 2, 2016, Judge Hutchinson granted an application to amend the

January 28, 2016 Order to authorize the interception of communications over two

additional phones:

(4)     a telephone with the number 678-887-2540 (GTT 4) allegedly used by

Dossie Mann;

(5)     a telephone with the number 678-832-3114 (GTT 5), allegedly used

by Defendant Clark.

---

[1] The Affidavit of FBI Special Agent Paul Szabo, dated August 2, 2016, supporting a federal wiretap for Target Telephone 1 ("TT1") provides a history of the applications for state court wiretaps relating to this case.

[Doc. 1250-2.]  Interception over TT4 and TT5 began on February 2, 2016, and ceased on February 16, 2016.  (TT1 Aff. ¶ 20.)  Clark, Evans, and others were intercepted over GTT 4 and GTT 5.  (*Id.*)

On February 4, 2016, Judge Hutchinson authorized interception of communications over 762-333-5400 (GTT 6), a phone allegedly used by Evans. [Doc. 1250-4.]  Interception over GTT 6 occurred only on February 4, 2016.  (TT1 Aff. ¶ 21.)  In a separate order also dated February 4, 2016, Judge Hutchinson authorized interception of communications over 718-737-8836 (GTT 7), a phone also believed to be used by Evans.  (*Id.* ¶ 22.)  Interception began on February 4, 2016, and ceased on February 16, 2016.

## II.  DISCUSSION

### A.  Title III Requirements

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.* ("Title III"), regulates the government's interception and disclosure of electronic surveillance or "wiretaps."  *See United States v. Degaule*, 797 F. Supp. 2d 1332, 1346 (N.D. Ga. 2011) (citation omitted), *report and*

6

*recommendation adopted*, *id.* at 1344.  Under Title III, an "aggrieved person"[2] can "move to suppress the contents of any wire or oral communications intercepted pursuant to [Title III], or evidence derived therefrom, on the grounds that—(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  18 U.S.C. § 2518(10).  Wiretap orders are presumptively valid, and a defendant moving to suppress wiretap evidence "has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained." *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *22 (N.D. Ga. Sept. 27, 2007) (collecting cases), *report and recommendation adopted, id.* at *1-15.  Georgia's wiretap application requirements are co-extensive with Title III.  *See* O.C.G.A. § 16-11-64(c); *United States v. Mayfield*, No. 2:16-CR-009-RWS-JCF, 2017 WL 9477736, at *8 (N.D. Ga. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 4330369 (N.D. Ga. Sept. 29, 2017).

---

[2] Under Title III, an "aggrieved person" is someone "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C.A. § 2510(11).

7

Title III sets out numerous requirements that wiretap applications and orders must meet to be valid.  Just one—the necessity requirement—is relevant to Evans's motion.  The necessity requirement requires that the application for a wiretap order contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  If, based on a wiretap application, the issuing judge determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," the wiretap may be authorized.  *Id.* at § 2518(3)(c).  "This 'necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.'"  *United States v. Maxi*, 886 F.3d 1318, 1331 (11th Cir. 2018) (quoting *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986)).

To show necessity, "[t]he affidavit must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.  However, the government is not required to comprehensively exhaust all possible investigative techniques before applying for a wiretap."  *United States v. Harrell*, 635 F. App'x 682, 685 (11th Cir. 2015) (citing *United States v. De La*

8

*Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) and *Van Horn*, 789 F.2d at 1496); *see also Maxi*, 886 F.3d 1318 (citations omitted).  This is because, as noted, the purpose of the necessity requirement is merely to ensure that, consistent with Title III's purpose, electronic surveillance is not "routinely employed" when other, less intrusive investigative methods are available.  *Van Horn*, 789 F.2d at 1496; *see also United States v. Giordano*, 416 U.S. 505, 515 (1974) (explaining that Title III's requirements are to ensure that wiretaps "were not routinely employed as the initial step in criminal investigation"); *Degaule*, 797 F. Supp. 2d at 1358 and n.20 (citations omitted) (discussing that the "government's showing on necessity must be read in a practical and commonsense fashion," to accomplish the "narrow" purpose of ensuring wiretaps were not used "as the initial step in criminal investigations").

### B.    Standing

Antecedent to Evans's substantive challenge to the wiretaps, the government contends that Evans lacks standing to challenge any of the wiretaps in this case because he was in custody while the wiretaps were active and therefore had no reasonable expectation of privacy with regard to any intercepted communications, all of which occurred over contraband cell phones.  [Doc. 1235 at 5-8.]  Evans has not responded to this argument.

9

In my Report and Recommendation dated July 12, 2019, I considered an identical argument and concluded that several of Evans's codefendants lacked standing to challenge state and federal wiretaps because they were, at the time, in custody using contraband cell phones and, thus, had no reasonable expectation of privacy in the intercepted communications. [*See* Doc. 1034 at 17-25.] There has been no intervening change in the law, and I see no reason to depart from my reasoning or conclusion now.

As noted above, under Title III, only an "aggrieved person" may move to suppress wiretap evidence. 18 U.S.C. § 2518(10)(a). To show that he is an "aggrieved person," a defendant must show that "(1) he was a party to the communication, (2) the wiretap efforts were directed at him; or (3) the interception took place on his premises." *See United States v. Benitez-Tornes*, No. 1:07-CR-279-CAP-GGB, 2008 WL 11348307, at *1 (N.D. Ga. Oct. 1, 2008) (quoting *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006)). The defendant bears the burden to show that he is an "aggrieved person." *Id.*; *United States v. Ortega-Estrada*, No. 1:07-CR-356-TWT-CCH, 2008 WL 4716949, at *2 (N.D. Ga. Oct. 22, 2008) (quoting 18 U.S.C. § 2518(10)(a)), *adopted*, *id.* at *1.

10

Although the Eleventh Circuit has not addressed the issue, district courts in this Circuit and elsewhere have held that the interception of an inmate's telephone calls over a contraband cell phone fall outside the purview of Title III protection. *See, e.g., United States v. Allen*, No. CR417-208, 2018 WL 6242868, at *1-3 (S.D. Ga. Nov. 29, 2018), *report and recommendation vacated in part sub nom. United States v. Jenkins*, 2019 WL 112785 (S.D. Ga. Jan. 4, 2019) and *adopted in relevant part*, 2019 WL 254661 (S.D. Ga. Jan. 17, 2019); *United States v. Nava*, No. 1:17-CR-347-TCB-CMS, 2018 WL 5624731, at *4 (N.D. Ga. Aug. 9, 2018), *report and recommendation adopted*, 2018 WL 4350183 (N.D. Ga. Sept. 12, 2018); *United States v. Morris*, No. 1:15-cr-351-WSD, 2016 WL 4267990, at *4-5 (N.D. Ga. Aug. 15, 2016); *accord United States v. York*, No. 116CR00069LJOSKO11, 2017 WL 5068143, at *4 (E.D. Cal. Sept. 29, 2017), *reconsideration denied*, 2017 WL 4959244 (E.D. Cal. Nov. 1, 2017). Those cases reason that (1) despite the seemingly broad definition of "aggrieved person" under the statute, the weight of authority nevertheless dictates that term must be interpreted in accordance with Fourth Amendment standing rules; and (2) because an inmate does not have a reasonable expectation of privacy in communications over a contraband phone, as prisoners have no expectation of privacy in their prison cells; therefore, (3) a

prisoner does not have standing to challenge the interception of communications over a contraband device.  *See*, *e.g., Morris*, 2016 WL 4267990, at *4-5.  Further, those opinions found the reasoning to square with federal and state laws prohibiting possession of cell phones by prison inmates.[3]  *Id.*; *see also Allen*, 2018 WL 6242868, at *2-3.  This logic is sound, and Court applies it again in this case.

The principle that the protections afforded an "aggrieved person" under Title III must be interpreted in accordance with standing requirements applied to suppression challenges under the Fourth Amendment is grounded in longstanding Supreme Court and Fifth Circuit decisions, *see Alderman v. United States*, 394 U.S. 165, 175 (1969) ("[Title III's] legislative history indicates that 'aggrieved person,' the limiting phrase currently found in Fed. Rule Crim. Proc. 41(e), should be construed in accordance with existent standing rules.") (citing S. Rep. No. 1097, 90th Cong., 2d Sess., at 91, 106)); *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975) (construing definition of aggrieved person in light of "prestatutory fourth amendment law"), as well as more recent cases from this district, *see, e.g.,*

---

[3] Both federal and state statutes criminalize the possession of cell phones by inmates.  *See* 18 U.S.C. § 1791 (establishing criminal penalties for possession of a prohibited objected," including mobile phones); O.C.G.A. § 42-5-18(c)-(d) (making possession of an unauthorized mobile phone a felony punishable by up to five years of imprisonment).

*United States v. Montemayor*, No. 1:09-CR-551-LMM-JFK, 2018 WL 4517634, at *2 (N.D. Ga. Aug. 27, 2018), *report and recommendation adopted,* 2018 WL 4517459 (N.D. Ga. Sept. 20, 2018); *United States v. Aguirre-Benitez*, No. 3:16-CR-009-TCB-RGV, 2017 WL 9477737, at *12 (N.D. Ga. Apr. 24, 2017), *report and recommendation adopted*, 2017 WL 2274621 (N.D. Ga. May 25, 2017) ("The standard used to determine whether a defendant is an aggrieved person is coextensive with the standing requirements applied to Fourth Amendment suppression claim.") (citations omitted); *Morris*, 2016 WL 4267990, at *4 (collecting cases); *United States v. Chaidez-Ontiveros*, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *5 (N.D. Ga. Oct. 25, 2011), *report and recommendation adopted*, 2012 WL 984269 (N.D. Ga. Mar. 21, 2012) ("An 'aggrieved person,' as defined both by [Title III], and in accordance with the Supreme Court's decision in *Alderman* . . . indicates that the Act's standing requirement implements existing Fourth Amendment standing rules."); *accord United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1116 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006) (citations omitted) ("The Supreme Court has interpreted the[ "aggrieved person"] provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by

13

the interception.); *United States v. William*s, No. CR418-147, 2019 WL 1612833, at *7 (S.D. Ga. Feb. 27, 2019)*, report and recommendation adopted*, No. CR418-147, 2019 WL 1601375 (S.D. Ga. Apr. 15, 2019) (recognizing that even though Title III facially provides a "broad suppression right," "[c]ourts have consistently recognized that the statutory provision incorporates existing Fourth Amendment 'standing' limitations").   As a result, defendants challenging carceral wiretap interception of contraband devices must establish not merely that they are "aggrieved persons" under Title III, but also that they have standing under the Fourth Amendment.

To demonstrate standing under the Fourth Amendment, a defendant "bears the burden of establishing 'both a subjective and an objective expectation of privacy' in the area or object searched." *United States v. Daniels*, 554 F. App'x 885, 886 (11th Cir. 2014) (quoting *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)).   "'The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.'" *Id*. (quoting *Segura-Baltazar*, 448 F.3d at 1286).   "'[O]nly individuals who actually enjoy the reasonable expectation of privacy have standing

14

to challenge the validity of a government search.'" *Id.* (quoting *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (alteration supplied).

Evans nowhere disputes that he was in custody during the relevant time period or that it is illegal to possess an unauthorized cell phone while in custody. Nor does he maintain that he had a subjective expectation of privacy with respect to communications over contraband cell phones, much less point to any authority to suggest that society would recognize such an expectation. And nor could he. The Supreme Court has made clear that inmates generally have no expectation of privacy—and, thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984). In the absence of any reasonable expectation of privacy, it follows that Evans lacks standing to challenge the interception of communications over contraband cell phones while he was in custody, and his motion should be denied on that basis.

But even if Evans had standing to challenge the wiretaps in this case, his argument that the applications lack necessity fails on it merits for the reasons discussed in the next section.

15

### C.   Necessity

As outlined above, Title III's necessity requirement calls for wiretap applications to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). As discussed, "[t]o show necessity, the 'affidavit need not . . . show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" *Maxi,* 886 F.3d at 1331 (quoting *Van Horn*, 789 F.2d at 1496). "The purpose of the necessity requirement is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques," *Ortega-Estrada*, 2008 WL 4716949, at *7 (quoting *United States v. Pecheco*, 489 F.2d 554, 565 (5th Cir. 1974)) (internal quotation and alteration marks omitted)), and, thus, "the government's burden of proving necessity is not high," *id.* (quoting *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991) (internal quotation omitted). Further, in a court's review of challenged wiretaps, a defendant must overcome their presumptive validity, *see Flores*, 2007 WL 2904109 at *22.

16

### 1.   Summary of Wiretap Applications

The state wiretaps that Evans challenges were supported by four affidavits signed by Gwinnett County Police Department Homicide Detective Patrick Watson: one dated January 28, 2016 for GTTs 1-3, one dated February 2, 2016 for GTTs 4-5, and two dated February 4, 2016, for GTTs 6 and 7. (*See* Govt. Resp. Exs. 6-9 [Docs. 1250-5 through 1250-8].) The detail concerning the necessity for all of the wiretaps is laid out in Detective Watson's first affidavit, which he provided in support of the application to intercept communications on GTT 1 through GTT 3. (Gov't Resp. Ex. 6 ("GTT1 Aff.") [Doc. 1250-5].) In the three later affidavits supporting the applications to intercept GTT 4 through GTT 7, Detective Watson incorporated by reference his statements concerning necessity that he relayed in his first affidavit. (*See* Gov't Resp. Exs. 7-9 [Doc. 1250-6 (Feb. 2, 2016 Aff. for GTT 4 and GTT 5), 1250-7 (Feb. 4, 2016 Aff. for GTT 6), & 1250-8 (Feb. 4, 2016 Aff. for GTT 7)].) Thus, as Evans concedes, the relevant inquiry is into Detective Watson's first affidavit. [*See* Doc. 1148 at 8.]

In that first affidavit, spanning 93 pages (including five pages of exhibits), Detective Watson summarized the background of law enforcement's investigation into the Nine Trey Gangster Blood street gang, the hierarchy of the gang, how the gang operates both inside outside Georgia prisons, and the gang's alleged

involvement in various crimes, including a homicide in Gwinnett County, Georgia—the murder of Anderson that Evans allegedly ordered. (*Id.* at 16-68.)

In a nine-page section of the affidavit titled "Need for Interception of Wire Communication and Usefulness of Alternative Investigative Techniques," Detective Watson described numerous investigative techniques that law enforcement had used, were then presently using, or had decided not to use, and explained the limitations associated with those techniques and why certain techniques were not viable options to pursue. (GTT 1 Aff. at 75-83.) With particular reference to Evans, Detective Watson explained that he believed Evans was a "significant operative within a larger network of the Bloods Gang," responsible for recruiting new members and directing criminal activity from prison. (*Id.* at 76.) Physical surveillance, Detective Watson explained, was impossible because Evans was at the time incarcerated at Hancock State Prison, and another principal target of the investigation, Durell Lewis,[4] who had allegedly participated in armed robbery and murder in furtherance of the gang enterprise, had recently moved to a location that effectively prevented covert surveillance based upon its

---

[4] Significantly, Lewis was identified as the user of GTT 2, and thus one of the focuses of Detective Watson's affidavit. Presumably, Lewis is also the "D.L." referred to in the second superseding indictment.

geography.  (*Id.* at 77; *see also id.* at 14 (summarizing alleged roles of Lewis and Evans in the gang).)  Detective Watson relayed that law enforcement had attempted to surveil Lewis within another Lawrenceville, Georgia neighborhood; however, immediately upon entering the neighborhood, individuals sent text messages and called out to each other to indicate police presence in the area.  (*Id.* at 77.)  Detective Watson further averred that because physical surveillance would not "provide much insight into the scope of the organization's activities," the interception of communications would better "allow agents to develop a clearer picture of the activities of the organization and the movements of unidentified members of the organization, thus allowing *future* surveillance to be conducted more efficiently and effectively."  (*Id.* (emphasis added).)

Detective Watson also stated that using grand jury subpoenas to call witnesses believed to be involved in the gang would likely not be successful as the witnesses would likely be uncooperative (at a minimum invoking their rights against self-incrimination), and the process would likely tip off gang members to the investigation, which would drive the operation even further underground and could result in the destruction of evidence or flight.  (GTT 1 Aff. at 77-78.)  Grand jury subpoenas for phone records would also be of limited value because they

would reveal historical information only and, based on Detective Watson's experience, robbery and homicide suspects often obtain cell phones in fictious names or names of third parties, or they obtain prepaid cell phones that have no corresponding subscriber information. (*Id*. at 78.)

Detective Watson also relayed that using confidential informants or cooperating individuals would not be fruitful, as there were no known or available informants who could obtain information from the target subjects at the time. (GTT 1 Aff. at 79.) He also stated that based on his training and experience, he knew that members of criminal organizations were typically unwilling to discuss the structure and operation of the organization with persons outside the organization. (*Id.*) Detective Watson did not believe that an informant would be able to infiltrate the gang; and even if an informant could infiltrate the gang, Detective Watson explained that such an informant would be in danger and law enforcement would be unable to constantly observe and protect the informant. (*Id.*)

Detective Watson also stated that using undercover agents would not be a viable investigation technique for many of the same reasons, including that individuals involved in crimes are "invariably suspicious of anyone with whom they have not transacted before." (GTT 1 Aff. at 79.) This was especially true for

20

"upper-level members of the organization" (such as allegedly Evans), who prefer to rely on close friends or relatives or "other persons with ties to their cultural or geographic background."  (*Id.*)  In this case, Detective Watson explained, law enforcement had no "intermediary source or person to introduce an undercover agent to TARGET SUBJECTS and their co-conspirators."  (*Id.*)  In addition, given the difficulties with using undercover agents or confidential informants, consensual monitoring would have limited value, especially in acquiring information about higher-level participants in the gang.  (*Id.* at 79-80.)

Detective Watson next explained that interviews of witnesses or targets of the investigation would have a "minimal" likelihood of success because investigators had been unable to identify anyone relevant to interview, except for Evans and Lewis—whom law enforcement believed murdered Anderson at Evans's behest—and records custodians, who only had knowledge of the limited information contained in billing records and other documents.  (GTT 1 Aff. at 15, 80.)  Detective Watson further relayed that based on his experience, it was doubtful that if gang members were arrested, they would be willing to cooperate, whether out of loyalty or fear of retaliation.  (*Id.* at 80.)

Detective Watson next stated that search warrants and consent searches would have limited value because Evans was incarcerated, and the only known item of evidentiary value was a contraband cell phone allegedly in his possession. (GTT 1 Aff. at 81.)  The physical data on that phone, however, would not provide evidence needed to further the investigation into the gang. (*Id.*)  Similarly, a search of Lewis's then-present residence would likely not yield additional material evidence because of the amount of time that had passed since the alleged murder and a search of devices in Lewis's possession would have only limited value. (*Id.*)  Trash pulls would also not likely yield items of evidentiary value, especially as to Evans, as he was incarcerated. (*Id.*)  In addition, Detective Watson explained that potentially useful items seized in a trash pull often lack context and meaning in the absence of intercepted communications. (*Id.*)

Finally, Detective Watson stated that toll records and pen registers were helpful to some extent, but that those techniques were limited because they do not reveal the contents of communications or the parties to the communications. (GTT 1 Aff. at 82.)  He further reiterated that gang members often subscribe to telephones using fictious names or the names of others in an attempt to thwart investigators. (*Id.*)

### 2.    Discussion

Evans argues that Detective Watson's affidavit does not establish necessity because it failed to "detail[] the investigation's use of alternative investigation methods and techniques" but instead "used boilerplate language and conclusory statements."[5]   [Doc. 1148 at 8.]   Evans specifically takes issue with Detective Watson's statements that:

- "other methods would fail because Defendant [Evans] is incarcerated at Hancock State Prison," [*id.* (citing GTT 1 Aff. at 77)];

- "Grand Jury subpoenas would likely not be successful because those called to testify would likely be uncooperative," [*id.* (citing GTT 1 Aff. at 77-78)]; and

- "no viable confidential human sources have been identified that are able to infiltrate the gang," [*id.* (citing GTT 1 Aff. at 79)].

Evans further argues that "agents failed to take any measures to determine if any sources or confidential informants were in fact available and/or willing to cooperate

---

[5] Notably, the vast majority of Evans' motion consists of boilerplate recitation of Title III law, and provides only a page and a half of argument specific to the purported lack of necessity shown in Detective Watson's affidavit. [*Compare* Doc. 1148 at 1-7, *with id.* at 8-9.]

23

with the investigation," and that Detective Watson instead "simply states that members of criminal organizations usually do not want to cooperate." [*Id.*] He finally contends that Detective Watson's assertion that interviewing witnesses or targets would likely fail is deficient because "simply stating that the likelihood of success of interviewing these individuals is minimal because investigators have failed to identify any individuals to interview," and that it beggars belief that an agent could not identify any individual to interview in "a very well known, multidistrict street gang" such as the one that law enforcement was investigating. [*Id.* (citing GTT 1 Aff. at 80).]

Viewing Detective Watson's affidavit as a whole—and in a common sense fashion—the Court concludes that he adequately explained the limitations with various investigative techniques based both on his own experience and in law enforcement's then-present attempts to obtain evidence in connection with the investigation of the Nine Trey Gangsters organization, including its high-ranking members. Evans's argument ignores much of the recitation described above, as well as the crucial difference between meaningless boilerplate language on the one hand, and generally applicable facts that pertain across investigations of gang activity on the other. Indeed, Evans fails to identify or explain why any purported

"boilerplate" language in Detective Watson's affidavit was not in fact true. While Evans may be correct that some traditional investigative techniques might have yielded some additional modicum of information about the alleged conspiracy, "[n]othing in the law requires that the traditional methods be entirely useless or that the district court force the government to redefine its objectives." *United States v. Allen*, 274 F. App'x 811, 816 (11th Cir. 2008). Taking the information that Detective Watson related as a whole, there is no basis to second-guess Judge Hutchinson's determination that the facts presented to him were sufficient to establish necessity.

In sum, the Court finds that Evans has not met his burden to show that Detective Watson's affidavit was deficient in demonstrating that electronic surveillance was necessary—that is, that Detective Watson failed to explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. Accordingly, even if Evans had standing to challenge the intercepted communications, his motion to suppress should be denied.

## III.   CONCLUSION

For all the reasons explained above, it is **RECOMMENDED** that Evans's Motion to Suppress Intercepted Communications and Evidence Derived Therefrom, Pursuant to Title III [Doc. 1148.] be **DENIED**.

25

I have now ruled on all pretrial matters referred to me with respect to this defendant.[6]  Accordingly, this matter as to Defendant Evans (2) is **CERTIFIED READY FOR TRIAL**.[7]

**IT IS SO RECOMMENDED** this 1st day of April, 2020.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[6] Evans filed a motion for *Daubert* hearing concerning the government's handwriting expert [Doc. 1118], which has been deferred to the District Judge.

[7] The government recently superseded the indictment in this case and added two additional defendants.  [*See* Doc. 1158.]  Since those defendants' cases have not yet been certified ready for trial, the District Court is not required to place his case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).